CLERKS OFFICE US DISTRICT COURT
AT ROANOKE, VA
FILED
January 14, 2025
LAURA A. AUSTIN, CLERK
BY: /s/ S. Wray
       DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| | ) Case No. 7:24-cr-011 |
| v. | ) |
| | ) |
| ISAAC FIDEL MARTINEZ-CHAVEZ | ) By:   Michael F. Urbanski |
| | ) Senior United States District Judge |
| | ) |
| | ) |

## MEMORANDUM OPINION

This matter is before the court on defendant Isaac Martinez-Chavez's motion to suppress several pieces of evidence, namely, an RG Industries .22 caliber revolver, a Marlin ("MAR") Firearms Co., .22 caliber bolt action rifle, and ammunition, magazines, and accessories, which were recovered from the car Mr. Martinez-Chavez was driving on January 1, 2024. ECF No. 59. A hearing on the motion to suppress was held on January 3, 2025. ECF No. 82. At the hearing, the Franklin County law enforcement officers who recovered this evidence, Lieutenant Justin Hylton and Officer Trey Poulin, testified, and evidence, including body camera footage from both officers, was received and reviewed by the court. Hr'g Tr., ECF No. 93. As the court stated at the hearing, the court found the officers' testimony to be credible. Id. at 104. Because Mr. Martinez-Chavez's Fourth Amendment Rights were not violated at any juncture in the recovery of this evidence, the motion to suppress is **DENIED**.

**I.**

In the early hours of January 1, 2024, Lieutenant Justin Hylton of the Franklin County Sheriff's Office observed a silver Kia travelling 60 miles per hour on South Main Street in

1

Rocky Mount, where the posted speed limit is 45 miles per hour. Hr'g Tr., ECF No. 93 at 5-6. He followed the Kia. Id. at 6. As the vehicle turned onto Scuffling Hill Road, which is a public road, Lieutenant Hylton observed the car's headlights and taillights turn off while the car was still traveling. Id. at 7-8. At that point, Lieutenant Hylton decided to activate his emergency lights. Id. at 8. He continued to follow the silver Kia as it turned, lights still off, onto Highview Terrace, which is also a public road, and eventually pulled into a yard, where other cars were parked outside a residence. Id. at 8-10.

      As the driver of the Kia opened the door and prepared to exit his vehicle, Lieutenant Hylton observed the driver reach into the passenger's side of the car. Id. at 10. At the suppression hearing, Lieutenant Hylton testified, "With the behavior that I felt that he was trying to get away from me [referring to the speeding and turning off of the vehicle's lights], when I observed him reaching into the passenger side of the vehicle, I thought that he could be going for a weapon, and I wanted to eliminate that opportunity of one of us getting hurt." Id. at 12. Accordingly, Lieutenant Hylton drew his gun and ordered the driver to show his hands as he exited the vehicle. Id. at 12-13.

      At this point, Lieutenant Hylton manually activated his body camera. Id. at 15. Although the footage is initially difficult to make out for the first two minutes and eighteen seconds because the camera was dropped on the ground, Lieutenant Hylton can be heard asking the driver, who was eventually identified as Mr. Martinez-Chavez, how much he had had to drink that night and other questions related to his driving. Lieutenant Hylton Body Camera Footage ("Hylton BCF"), ECF No. 59-4 at 0:00-2:18. Once the camera was picked up, it shows Lieutenant Hylton examining Mr. Martinez-Chavez's wallet, looking at his

2

identification, and radioing dispatch to conduct a routine check of Mr. Martinez-Chavez's criminal record and for outstanding warrants. Id. at 2:18-4:17. During this period, around time 2:55 of the body camera footage, another man approached the vehicle and Mr. Martinez-Chavez. Id. at 2:55. They began having a conversation in Spanish. Id. at 2:55-3:16. Around time 3:14, Lieutenant Hylton can be heard shouting at the man to "stay out of the car" and "not get involved." Id. at 3:14. At this point in the encounter, Lieutenant Hylton was still the only law enforcement officer present.

At time 3:51 on the footage, Officer Trey Poulin arrived, id. at 3:51, accompanied by Sergeant Johnson (first name not specified). Hr'g Tr., ECF No. 93 at 24. At approximately time 4:17, Officer Poulin and Lieutenant Hylton approached the vehicle with their flashlights, leaving Mr. Martinez-Chavez with Sergeant Johnson. Hylton BCF, ECF No. 59-4 at 4:17. Lieutenant Hylton approached the driver's side while Officer Poulin approached the passenger's side, both peering into the vehicle. Id. At time 4:33, Officer Poulin exclaimed, "Hey, there's a fucking gun in here man . . . a sawed-off shotgun." Id. at 4:33. Lieutenant Hylton replied, "Yeah, he was reaching for something." Id.

Almost immediately upon this revelation, at approximately 4:38, Officer Poulin opened the passenger's side door. Id. at 4:38. This revealed the sawed-off weapon he had identified, which turned out to be a Marlin ("MAR") Firearms Co., .22 caliber bolt action rifle (not shotgun), and, tucked slightly further under the passenger's seat but still visible, a revolver, which turned out to be an RG Industries .22 caliber revolver. Hr'g Tr., ECF No. 93 at 83-84. At time 4:52 on the footage, dispatch can be heard buzzing Lieutenant Hylton and informing him of outstanding warrants for Mr. Martinez-Chavez, including one in Montgomery County

for a felony probation violation. Hylton BCF, ECF No. 59-4 at 4:52. While continuing to search the vehicle, the officers also found ammunition near the firearms in the front console area of the vehicle. Hr'g Tr., ECF No. 93 at 84-85.

## II.

"In deciding a motion to suppress, the district court is empowered to make findings of fact, and conclusions of law." United States v. Adkinson, 191 F. Supp. 3d 565, 568 (E.D. Va. 2016) (citing United States v. Stevenson, 396 F.3d 538, 541 (4th Cir. 2005)). "At a hearing on a motion to suppress, the credibility of the witness and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." United States v. McKneely, 6 F.3d 1447, 1452-53 (10th Cir. 1993). "As a general rule, the burden of proof is on the defendant who seeks to suppress the evidence." Adkinson, 191 F. Supp. 3d at 568. "The defendant bears the burden of proving that he has a reasonable expectation of privacy. If the defendant does have such an expectation, then the court must determine the reasonableness of the search and seizure." United States v. Rusher, 966 F.2d 868, 874 (4th Cir. 1992) (internal citation omitted). "Once the defendant establishes a basis for his suppression motion, the burden shifts to the government." Adkinson, 191 F. Supp. 3d at 568 (citing United States v. Matlock, 415 U.S. 164, 177-78 (1974)).

## III.

After considering the facts presented at the suppression hearing, the court concludes that no Fourth Amendment violation occurred in this case because (1) the vehicle Mr. Martinez-Chavez was driving was lawfully stopped, (2) the first firearm was seen through the

4

window of the vehicle in plain view while law enforcement officers were still making inquiries within the lawful scope of the stop, and (3) seeing the firearm, which one officer immediately identified as a sawed-off weapon, in the context of the encounter as it had evolved, gave the officers grounds for conducting a protective search of the vehicle, and, indeed, probable cause for a search under the automobile exception to the warrant requirement.

First, Mr. Martinez-Chavez was lawfully stopped under Terry v. Ohio, 392 U.S. 1 (1968) and Whren v. United States, 517 U.S. 806 (1996). Under Terry, "an officer may conduct a brief investigatory stop where the officer has reasonable suspicion that criminal activity may be afoot." United States v. Perkins, 363 F.3d 317, 321 (4th Cir. 2004) (citing Illinois v. Wardlow, 528 U.S. 119, 123 (2000)). Reasonable suspicion can be founded on less than probable cause. Wardlow, 528 U.S. at 123. Courts determine the validity of a Terry stop based on the totality of the circumstances. United States v. Sokolow, 490 U.S. 1, 8 (1989). As is often the case with Fourth Amendment analysis, "factors which by themselves suggest only innocent conduct may amount to reasonable suspicion when taken together." Perkins, 363 F.3d at 321 (citing United States v. Arvizu, 534 U.S. 266, 274-75 (2002)).

As for traffic stops in particular, "[o]bserving a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop." United States v. Branch, 537 F.3d 328, 335 (4th Cir. 2008). Under Whren, the constitutional reasonableness of a traffic stop does not depend on the "actual motivations of the individual officers involved." 517 U.S. at 813. Thus, once an officer observes a traffic violation, such as speeding, a stop is constitutionally

5

reasonable, regardless of whether the officer may also be intent upon investigating criminal activity beyond that traffic violation.

Here, Lieutenant Hylton observed the silver Kia driven by Mr. Martinez-Chavez travelling 60 miles per hour in a zone with a 45 miles per hour posted speed limit. Hr'g Tr., ECF No. 93 at 5-6. Lieutenant Hylton then observed the car's headlights and taillights turn off while the car was still traveling on a public road. Id. at 7-8. Under Terry and Whren, these two traffic violations are sufficient to justify a proper stop under the Fourth Amendment.

Mr. Martinez-Chavez argues that the stop was invalid because Lieutenant Hylton waited to initiate the stop after he initially observed the vehicle speeding and because, as Lieutenant Hylton freely admits, he was interested in apprehending a violation more severe than speeding, like a DUI, on the night in question (New Year's Eve/Early New Year's Day). Reply, ECF No. 81 at 2. However, this line of argumentation is foreclosed by Whren, which holds the Fourth Amendment test to be objective, rather than subjective. 517 U.S. at 813 (refusing to consider, under the Fourth Amendment, whether traffic violations were used pretextually to justify a stop that was likely motivated by law enforcement officers' desire to find evidence of a drug crime). Because, objectively, multiple traffic violations occurred here, it does not matter that Lieutenant Hylton may have harbored suspicions about other, less immediately discernable violations or may have been motivated by the possibility that still other criminal activity was afoot.

The delay between Lieutenant Hylton observing the first speeding infraction and stopping the silver Kia might be pertinent if the court needed to determine when in this sequence of events Lieutenant Hylton formulated the subjective desire to stop the vehicle.

6

However, once again, Whren sets out an objective standard, and objectively, at least two traffic violations had been observed by the time the stop occurred in this case. 517 U.S. at 813. Moreover, there is nothing constitutionally suspect about an officer observing violations but waiting for the right moment to initiate a stop, perhaps, as here, after multiple violations have accumulated. Indeed, in Whren itself, officers did not initiate a stop the very moment their "suspicions were aroused," but rather followed the vehicle in question and waited until they had observed multiple traffic violations before actually stopping the vehicle. Id. at 808-09. Thus, regardless of which event triggered Lieutenant Hylton's decision to stop the silver Kia, the stop in this case, from which the discovery of the evidence at issue ultimately flowed, was constitutional.

Second, Lieutenant Hylton and his colleagues were still acting within the constitutional scope of the initial lawful stop at the time the sawed-off firearm was observed in plain view, thus completing the picture of suspicion justifying a search. Although the "maximum acceptable length of a routine traffic stop cannot be stated with mathematical precision," the "appropriate constitutional inquiry is whether the detention lasted longer than was necessary, given its purpose." Branch, 537 F.3d at 336 (citing Florida v. Royer, 460 U.S. 491, 500 (1983) (plurality opinion)). A stop is certainly constitutional for the time it takes to "perform the traditional incidents of a routine traffic stop," such as "'request[ing] a driver's license and vehicle registration, run[ning] a computer check, and issu[ing] a citation.'" Id. at 335 (citing United States v. Foreman, 369 F.3d 776, 781 (4th Cir. 2004)). Where police officers are obstructed in completing these tasks, a longer stop is likely reasonable. Id. at 336. While the analysis turns on whether the purpose of the stop has been exceeded, it is worth noting that

7

the Supreme Court has sanctioned stops as long as twenty minutes. United States v. Sharpe, 470 U.S. 675, 687 (1985) (rejecting a bright-line, time-based rule and finding a twenty-minute detention reasonable under circumstances where officers were awaiting coordinated efforts from fellow officers).

Body camera footage in this case reveals that less than five minutes passed between the moment Lieutenant Hylton began conducting the business of the stop and the moment Officer Poulin caught sight of the sawed-off firearm. Hylton BCF, ECF No. 59-4 at 0:00-4:33. During the first two minutes and eighteen seconds of this period, Lieutenant Hylton can be heard on the (admittedly difficult to discern) body camera footage asking Mr. Martinez-Chavez questions germane to the stop, such as how much Mr. Martinez-Chavez had had to drink. Id. at 0:00-2:18. Once the camera was picked up off the ground, the footage shows Lieutenant Hylton examining Mr. Martinez-Chavez's identification and radioing dispatch to complete a check of Mr. Martinez-Chavez's criminal record and for outstanding arrest warrants. Id. at 2:18-4:17. Such standard checks are recognized as within the proper scope of a traffic stop. See United States v. Palmer, 820 F.3d 640, 649 (4th Cir. 2016) ("An officer is entitled to conduct safety-related checks that do not bear directly on the reasons for the stop, such as requesting a driver's license and vehicle registration, or checking for criminal records and outstanding arrest warrants.").

The time for completing these routine tasks was then, understandably, somewhat extended by the fact that a man approached Mr. Martinez-Chavez and his vehicle, causing Lieutenant Hylton, who was still the only law enforcement officer present, to yell for the man

8

to "stay out of the car" and "not get involved."[1] Hylton BCF, ECF No. 59-4 at 3:14. Nevertheless, all told, the stop had remained brief by the time Officer Poulin arrived. Id. at 3:51.

While still waiting to hear back from dispatch, about four minutes and seventeen seconds into the stop, Lieutenant Hylton began walking around the driver's side of the vehicle while Officer Poulin approached the passenger's side. Id. at 4:17. Both officers looked in through the windows with their flashlights. Id. Then, at time 4:33 on the footage, Officer Poulin exclaimed, "there's a fucking gun in here, man . . . a sawed-off shotgun." Id. at 4:33. Because the entire encounter had still lasted less than five minutes and the officers were still awaiting a response from dispatch, the permissible scope of the stop had not been exceeded by the time the firearm was observed in plain view.

Simply seeing the gun was not a Fourth Amendment event. That the gun was in plain view matters because "[v]iewing an article that is already in plain view does not involve an invasion of privacy and, consequently, does not constitute a search implicating the Fourth Amendment." United States v. Jackson, 131 F.3d 1105, 1108 (4th Cir. 1997). Mr. Martinez-Chavez argues that because Officer Poulin had to shine his flashlight into the vehicle and, presumably, crane his neck to peer under the passenger's seat, the gun was not actually in plain view. Mot. Suppress, ECF No. 59 at 9. However, this argument was rejected by the Supreme Court in Texas v. Brown. 460 U.S. 730, 739 (1983). There, the Court found it "beyond dispute" that an officer's "action in shining his flashlight to illuminate the interior of [a defendant's] car

---

[1] The man can be heard on the body camera footage having a conversation with Mr. Martinez-Chavez in Spanish. Hylton BCF, ECF No. 59-4 at 2:55-3:16. Lieutenant Hylton does not speak Spanish, so he was not aware at the time that Mr. Martinez-Chavez was asking repeatedly for the man to close the door of the car, which Mr. Martinez-Chavez had left open when exiting to speak with Lieutenant Hylton. Hr'g Tr., ECF No. 93 at 21-23.

9

trenched upon no right secured to the latter by the Fourth Amendment." Id. at 739-40. The Court also concluded that it was "irrelevant to Fourth Amendment analysis" that the officer "'bent down at an angle so [he] could see what was inside" the defendant's car because the "general public could peer into the interior of [the defendant's] automobile from any number of angles." Id. at 740. Thus, because the sawed-off firearm was observed through the car's window in plain view during the lawful scope of a lawful stop, no Fourth Amendment violation had occurred by this pivotal point in the encounter.

Third and finally, once the sawed-off firearm was observed, it was objectively reasonable for the officers to open the car door, initiating a search that could be justified—even without a warrant—either as a protective search or as an automobile search founded on probable cause, or indeed as a combination thereof. The presence of the sawed-off firearm materially transformed the encounter. Objectively, weapons heighten the danger facing police, and firearms, particularly sawed-off firearms, can be indicative of criminal activity. United States v. Kelley, No. 7:16-cr-022, 2016 WL 4257377, at *7 (W.D. Va. Aug. 11, 2016) (noting that "even where firearms or other weapons are legally possessed, the potential for violence in an altercation is greater if those weapons are present"). Lieutenant Hylton's prior observations were thus cast in a new light by this discovery. It is at this point in the body camera footage, just after Officer Poulin announced his discovery of the sawed-off weapon, that Lieutenant Hylton shared that "yeah, he was reaching for something." Hylton BCF, ECF No. 59-4 at 4:33. At the suppression hearing, Lieutenant Hylton credibly testified that, earlier, he had noticed Mr. Martinez-Chavez leaning toward the front passenger's area of the vehicle, and he explained that he had considered that Mr. Martinez-Chavez may have been reaching

10

for a gun. Hr'g Tr., ECF No. 93 at 10-13. Lieutenant Hylton was sufficiently alarmed that he drew his service weapon and asked Mr. Martinez-Chavez to show his hands while exiting his vehicle. Id. Once it was revealed that a weapon had indeed been accessible in the passenger's area, an officer who had previously seen Mr. Martinez-Chavez reaching into that area would have objective grounds for believing Mr. Martinez-Chavez could pose a threat to officer safety, or indeed might be intent to evade apprehension for criminal activity beyond speeding. This is particularly true considering the other features of the encounter to that point: it was the middle of the night; speeding, pulling off the road, and turning off the vehicle's headlights and taillights could be understood as evasive driving behaviors; and another person had approached the vehicle, interfering with the stop while Lieutenant Hylton was still the only officer present. In other words, the gun completed a picture of the events to that point that would have justified any officer in searching the vehicle.

The search was justified as a protective search under Michigan v. Long. 463 U.S. 1032 (1983). There, the Supreme Court held that during a lawful Terry or traffic stop, a warrantless search "of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." Id. at 1049 (internal citations omitted). In United States v. Holmes, the Fourth Circuit applied Long to condone a protective search of a vehicle's passenger's compartment, including the center console and glove compartment, even in circumstances where the defendants had cooperated with police

11

commands and had been handcuffed a distance from the car with multiple officers separating the defendants from the car. 376 F.3d 270, 278-81 (4th Cir. 2004). Then, in United States v. Elston, the Fourth Circuit more explicitly concluded that officers are permitted to conduct a protective search of a vehicle "if they have a reasonable belief that the suspect is dangerous and may gain control of weapons inside the vehicle . . . [,] even if the suspect is under police restraint at the time the search is conducted, because the suspect may be able to escape such restraint or may later regain access to the vehicle if he is not arrested." 479 F.3d 314, 320 (4th Cir. 2007). Finally, in United States v. Carico, the Fourth Circuit concluded the police were permitted to perform a protective search of a vehicle where the defendant had been stopped "because an unauthorized weapon was visible in his vehicle." 311 Fed. App'x 572, 574 (4th Cir. 2008). Supreme Court and Fourth Circuit precedents therefore clearly authorize law enforcement officers to perform warrantless protective searches of vehicles upon a reasonable belief that a stopped driver poses a weapons-related safety risk.

      Here, seeing a weapon in an area of Mr. Martinez-Chavez's vehicle into which Mr. Martinez-Chavez had previously been seen reaching provided the officers grounds for the "reasonable belief" that Mr. Martinez-Chavez was "dangerous and may gain control of weapons inside the vehicle," particularly when this fact is considered in the context of other facts like Mr. Martinez-Chavez's driving behaviors and the fact that another man interrupted the stop. Elston, 479 F.3d at 320. As of the moment the gun was noticed, the officers were constitutionally justified in conducting a protective search, and it was at this very moment—and no sooner—that they did indeed initiate such a search. Hylton BCF, ECF No. 59-4 at 4:38. Upon the opening of the car door, a revolver was visible directly behind the sawed-off

shotgun, somewhat tucked under the passenger's seat. Hr'g Tr., ECF No. 93 at 83-85. Officers retrieved both weapons along with ammunition, which was found in the center console area. Id. The floor area under the passenger's seat and the center console area certainly qualify as within the "passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden," so the search was comfortably within the proper scope of a protective search under Long. 463 U.S. at 1049. True, Mr. Martinez-Chavez was secured some ways away from the vehicle during the search. Hr'g Tr., ECF No. 93 at 14. However, Holmes, Elston, and Carico make this fact irrelevant. Thus, because the two firearms and ammunition were recovered during a proper protective search, no Fourth Amendment violation occurred.

The search could also be justified as a vehicular search supported by probable cause. Since Carroll v. United States, the Supreme Court has long held that warrantless searches of automobiles are constitutional where supported by probable cause. California v. Acevedo, 500 U.S. 565, 569-72 (1991) (citing Carroll v. United States, 267 U.S. 132, 151 (1925)). This exception to the warrant requirement is based not only on the risk that evidence will be lost due to the mobility of automobiles, but also on the "reduced expectation of privacy stemming from . . . the range of police regulation" applicable to automobiles. California v. Carney, 471 U.S. 386, 393-94 (1985). The exception applies even where the vehicle in question is stationary. Id. (authorizing the search of a parked mobile home). Thus, a warrant was not needed to search the vehicle in this case, only probable cause.

Probable cause to think that evidence of a crime was contained within the vehicle here existed from the moment the sawed-off weapon was sighted. Possessing a sawed-off shotgun,

13

which was how Officer Poulin initially identified the weapon, or a sawed-off rifle, which was what the weapon turned out to be, is illegal under Va. Code Ann. § 18.2-300, subject to limited exceptions for researchers and collectors under Va. Code Ann. § 18.2-303.1. Because the standard is probable cause, not that required to convict a defendant of the suspected offense, the officers did not need to be certain no exceptions applied permitting Mr. Martinez-Chavez to lawfully possess a sawed-off weapon, though the fact that the gun was lying on the floor would tend to indicate that Mr. Martinez-Chavez was no collector. Moreover, all the other contextualizing features of the stop—driving that could be interpreted as evasive, the encounter with another man near the vehicle during the stop, and the fact that Lieutenant Hylton had observed Mr. Martinez-Chavez reaching for something in the passenger's side of the vehicle—combined with the presence of the weapon to establish probable cause to search for evidence of criminal activity beyond the possession of the first-noticed sawed-off firearm. These facts standing alone would be enough to justify the search that followed.

The body camera footage further reveals that seconds after the door was initially opened, and before either weapon was seized, the officers received word from dispatch that Mr. Martinez-Chavez was wanted on a felony probation violation. Hylton BCF, ECF No. 59-4 at 4:52. This informed the officers that Mr. Martinez-Chavez was a felon, rendering his possession of the already-observed firearm a federal crime under 18 U.S.C. § 922(g) and thus undeniably providing probable cause to continue the search. However, because the officers did not know Mr. Martinez-Chavez was a felon before opening the door, this information cannot retroactively justify that initiation of the search. Instead, before the door was opened, probable cause already existed based on the sawed-off firearm and the other facts of the

14

encounter known to the officers at that point, and the eventual revelation that Mr. Martinez-Chavez was a felon merely placed the officers on even firmer footing as they went on to discover a second gun and ammunition. And indeed, as is often the case, the protective search justification and the accumulating grounds for probable cause fed into each other, ensuring that the encounter was constitutional from beginning to end. See, e.g., Carico, 311 Fed. App'x at 574 (justifying warrantless search of a vehicle initially as a protective search, which then evolved into a warrantless search of an automobile, including non-passenger-accessible areas, based on probable cause when weapons and cash were found during the protective search).

Mr. Martinez-Chavez correctly points out that gun ownership is legal under many circumstances in Virginia, but his contention that this means a sawed-off firearm cannot be relied upon to justify a search is incorrect. Mot. Suppress, ECF No. 59 at 9-10. In the highly factually contextualized Fourth Amendment inquiry, courts routinely find objects that could be consistent with either lawful or unlawful activity to be grounds for probable cause or a reasonable belief that officer safety is threatened. See Brown, 460 U.S. at 742 (describing probable cause as a "flexible, common-sense standard"). The Supreme Court has explained that the Fourth Amendment "does not demand any showing" that the belief that items to be seized are incriminating is "correct or more likely true than false;" instead, a "practical, nontechnical probability that incriminating evidence is involved" is all that is required. Id. (internal quotations omitted). Accordingly, although an "opaque, green party balloon" is as consistent with a child's birthday party as it is with packaging narcotics, the Supreme Court has found that the seizure of such a balloon during an automobile stop was justified. Id. at 733, 744. And, as another example, although glass pipes might be used to smoke legal or illegal

15

substances, the Fourth Circuit has found that "it is still reasonable that a police officer would reach the belief that a glass pipe was evidence of a crime supporting probable cause." United States v. Runner, 43 F.4th 417, 422 (4th Cir. 2022); see also United States v. Jackson, 131 F.3d 1105, 1107, 1109 (4th Cir. 1997) (finding plain view exception applied where police observed potentially lawful objects like a scale, a sifter, plastic bags, numerous gelatin capsules, some white powder, and Isotol). Firearms are no different than balloons and glass pipes in that, although they can be used perfectly lawfully, they can also be used in the commission of crimes, and unlike comparatively inoccuous household objects indicative of drug crime, guns possess inherent dangers that must be considered by officers in assessing whether their safety is imperiled. It is therefore no surprise that the Fourth Circuit has held that "the possession of a firearm, though lawful, can contribute to reasonable suspicion in the totality of the circumstances" and, accordingly, that "the possession of a firearm plus something 'more' may 'justify an investigatory detention.'" Walker v. Donahue, 3 F.4th 676, 683 (4th Cir. 2021) (citing United States v. Black, 707 F.3d 531, 540 (4th Cir. 2013)); see also Kelley, 2016 WL at *7 (concluding that police are not prohibited from considering the presence of firearms in contemplating a Fourth Amendment search, in part because of "the potential for violence" where guns are present). This same logic justifies considering the presence of a firearm in developing either probable cause or a reasonable belief that a protective search is warranted.

      Here, the sawed-off firearm in plain view was one significant component contributing to probable cause and to the reasonable belief that a protective search was in order. But it was not the only piece in the puzzle, which was comprised of other facts like the fact that Mr. Martinez-Chavez had been seen reaching into the passenger's side of the vehicle where, it

transpired, the gun was stowed. Additionally, as the Fourth Circuit has previously recognized, the "type of firearm at issue" is highly pertinent, and here, even before the door was opened, Officer Poulin identified the visible firearm as a sawed-off firearm. See Walker, 3 F.4th at 684 (permitting police to consider the fact that the weapon they observed was "an AR-15-style assault rifle," which, the court noted, might "be treated differently than a handgun"). Thus, the sawed-off firearm in plain view was not the sole basis for the search in this case, but it was appropriately considered as a significant factor in making the search constitutionally reasonable.

## IV.

Thus, because the Fourth Amendment was not violated at any point in the recovery of the two guns and ammunition in the vehicle driven by Mr. Martinez-Chavez, no constitutional violation exists for which a suppression remedy would be proper. Thus, Mr. Martinez-Chavez's motion to suppress is **DENIED**.

It is **SO ORDERED**.

Entered: January 13, 2025

Mike Urbanski
Senior U.S.District Judge
2025.01.13 12:11:37
-05'00'

Michael F. Urbanski
Senior United States District Judge