CLERKS OFFICE US DISTRICT COURT
AT ROANOKE, VA
FILED
**January 17, 2025**
LAURA A. AUSTIN, CLERK
BY: **/s/ S. Wray**
DEPUTY CLERK

IN THE UNITED STATES DISTRICT
COURT FOR THE WESTERN DISTRICT
OF VIRGINIA ROANOKE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) Case No. 7:24-cr-00011 |
| v. | ) |
| | ) By: Elizabeth K. Dillon |
| ISAAC FIDEL MARTINEZ-CHAVEZ | ) Chief United States District Judge |

**MEMORANDUM OPINION AND ORDER**

Pursuant to a superseding indictment, defendant Issac Fidel Martinez-Chavez (Martinez-Chavez) faces one count of Felon-in-Possession of one or more firearms under 18 U.S.C. § 922(g)(1) and one count of Possession of a Firearm not Registered in the National Firearms Registration and Transfer Record under 26 U.S.C. §§ 5841, 5845(a)(4), 5861(d), and 5871. (*See* Dkt. No. 49.) The jury trial is scheduled for January 22–24, 2025. On January 10, 2025, during the pretrial conference, the court heard arguments for three pending pretrial motions filed by Martinez-Chavez: (1) Motion to Play Video Dury Jury Instructions on Unconscious Bias (Dkt. No. 62); (2) Motion in Limine to Exclude Proposed 404(b) Evidence Offered by the Government (Dkt. No. 68); and (3) Motion for Adverse Jury Instruction or Other Relief for Spoliation of Evidence (Dkt. No. 72). The court denied the first two motions from the bench and took the third motion under further advisement. For the following reasons, the court will deny Martinez-Chavez's motion for an adverse jury instruction or other relief for spoliation of evidence.

I.    BACKGROUND

The court adopts the summary of events surrounding the traffic stop on January 1, 2024, as outlined in the memorandum opinion issued by Judge Michael F. Urbanski, in which the court

denied Martinez-Chavez's motion to suppress evidence.[1]  (*See* Dkt. No. 100, at 1–4.)

The evidence at issue in the pending motion relates to the recorded radio communications between Lieutenant Justin Hylton and dispatch on the day of Martinez-Chavez's arrest.  In accordance with the Library of Virginia Record Retention and Disposition Schedule, "Dispatch (Communications) and Emergency Call Recordings: Not Retained as Evidence" are to be retained for a period of six (6) months after the event.[2]  (Va. Retention and Dispo. 8, Dkt. No. 72-4.)  These recordings may be preserved prior to their automatic disposition upon request to the records custodian.  The supporting documentation for those dispatch recordings, including "logs, reports, . . . Computer Aided Dispatch software and Calls-for-Service reports" shall be retained for a period of ten (10) years.  (*Id.* at 9.)  The Call-for-Service (CFS) report is a document detailing the nature of a dispatch call and includes details such as the location of the incident, relevant times, and responding officers' actions, among other things. (*See* CFS Report, Dkt. No. 72-5.)  "Investigative Case Files: Non-Serious Offenses" for unresolved cases are to be retained for a period of five (5) years after creation.[3]  (Va. Retention

---

[1] Martinez-Chavez filed a motion to suppress several pieces of evidence, namely, an RG Industries .22 caliber revolver, a Marlin ("MAR") Firearms Co., .22 caliber bolt action rifle, and ammunition, magazines, and accessories, which were recovered from the car Martinez-Chavez was driving on January 1, 2024. (Dkt. No. 59.) On January 3, 2025, a hearing on the matter was held, where the court heard testimony from the two officers who recovered the evidence. (*See* Transcript, Dkt. No. 93.)  In addition, other evidence was presented, including the body worn camera footage from both officers. (*Id.*)  After hearing the testimony, reviewing the other evidence, and considering the parties' arguments, the court found that Martinez-Chavez's Fourth Amendment rights were not violated, and as such, the motion to suppress was denied. (Dkt. No. 91.)

[2] "This series documents the radio communications between dispatch/central communications and officers in the field.  This series also documents the recording of incoming calls (including Next Generation 911) for fire, police, and rescue services, and the actions taken in response.  This series may include, but is not limited to: audio recordings, video recordings, text messages, and photographs."  (Va. Retention and Dispo. 8.)

[3] "This series documents the processes and results of any systematic investigations, inquiries, or examinations into criminal or suspected criminal acts that have been committed, are being committed, or are about to be committed; and may be related to, but not limited to: . . . drug/narcotic offenses, DUI, . . . and weapons law violations. This series may include, but is not limited to records pertaining to: . . . Breath Alcohol, Confiscated (non-weapon) Property, City-wide/In-car Surveillance/ Monitoring Recordings, Controlled Substance Seizures, Dispatch/ Communications Recordings, Emergency Calls, Evidence (including receipts and requests for), Field Notes, Fingerprints (including latents), Incident Reports, Lab Requests/ Reports/ Certificates of Analysis, Photographs,

and Dispo. 15.) For unresolved cases involving serious offenses, investigative case files shall be retained for one hundred (100) years after creation. (*Id.* at 17.)

On May 1, 2024, Martinez-Chavez sent his initial discovery request to the Government, seeking documents and tangible evidence related to his arrest, including any evidence that may be exculpatory. (*See* Def. Disc. Req., Dkt. No. 72-1.) On October 24, 2024, Martinez-Chavez sent an email to the Government requesting additional discovery material to include "[t]he radio runs (or dispatch calls) made by LT Hylton or any others regarding Mr. Martinez-Chavez that evening," noting that a formal discovery letter would follow. (*See* Additional Disc. Req., Dkt. No. 72-2.) The Government diligently began to look for the requested records but was unable to find the dispatch recordings. On December 12, 2024, the Government informed defense counsel via email that "In anticipation of the Discovery letter [], [the Government] had SA Moody look into it. He confirmed that there are no dispatch call/radio recordings because they were probably destroyed pursuant to the Retention Schedule." (Dkt. No. 72-3.)

Martinez-Chavez sent a formal discovery letter that same day, December 12, 2024, requesting dispatch calls, 911 calls, and radio runs. (Dkt. No. 80-6.) The dispatch recordings relating to the events of Martinez-Chavez's arrest on January 1, 2024, were classified under "Dispatch (Communications) and Emergency Call Recordings: Not Retained as Evidence," with a retention period of six (6) months following the date of the event. Consequently, the recordings were automatically destroyed in accordance with the Virginia Record Retention and Disposition Schedule before the request was made to the dispatch record custodian in October 2024.

---

Polygraphs, Release (Waiver) Forms, Summons, and Virginia Criminal Information Network/ National Crime Information Center (VCIN/NCIC) entries." (Va. Retention and Dispo. 14.)

3

II.  DISCUSSION

Martinez-Chavez asserts that the dispatch call recordings were exculpatory evidence that the Government was required to preserve.  He argues that "[t]he destruction of the dispatch calls and radio runs by the local police when they had a duty to preserve such evidence was intentional and willful, the evidence was relevant to Mr. Martinez's defense, and he is prejudiced without such evidence."  (Dkt. No. 72, at 6.)  During oral argument, Martinez-Chavez acknowledged that he does not think that the Government acted in bad faith, thus clarifying that he is not asserting a due process violation under *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).  Instead, he contends that an adverse inference jury instruction, or other appropriate relief, based on the spoliation of evidence is warranted under *California v. Trombetta*, 467 U.S. 479, 489 (1984), and *United States v. Johnson*, 996 F.3d 200, 215 (4th Cir. 2021).  The court disagrees.

**A.  Defendant is Not Entitled to an Adverse Inference Jury Instruction or Other Relief Under *Trombetta*.**

In *Trombetta*, the Supreme Court noted that there is a Constitutional duty imposed on States to preserve evidence, but "that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense."  *Trombetta*, 467 U.S. at 488.  "To meet this standard of constitutional materiality [] evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."  *Id.* (citation omitted).

First, the court does not find that the dispatch recordings were exculpatory evidence.  Martinez-Chavez's argument centers on time discrepancies between the CFS report, Lieutenant Hylton's body worn camera (BWC), officer written reports, and Lieutenant Hylton's testimony regarding the events surrounding Martinez-Chavez's arrest.  (*See* Dkt. No. 72.)  Lieutenant

4

Hylton testified that, as a patrol lieutenant, his vehicle was not equipped with an in-car camera. (Hr'g Tr. 9, Dkt. No. 93.)  Furthermore, his BWC was not activated until after Martinez-Chavez was out of his vehicle and behind his car.  (*Id.* at 15.)  While there are no recordings documenting the moments leading up to Martinez-Chavez's arrest before the BWC was activated, the dispatch recordings would not have provided any exculpatory value.

The CFS Report, which logs the communications between Lieutenant Hylton and dispatch, is particularly relevant.  As Lieutenant Hylton testified, he "would call into dispatch and ask them to log certain times." (Hr'g Tr. 42.)  Those times are reflected in the CFS Report, part of the investigative case file provided to Martinez-Chavez.  (*See* CFS Report.)  The court finds no reason to believe that the information in the CFS report differs from the communications between dispatch and the officers involved in Martinez-Chavez's arrest on January 1, 2024.  Additionally, Officer Poulin, who was on the phone with Lieutenant Hylton prior to the initiation of the traffic stop was monitoring the radio communications between Lieutenant Hylton and dispatch during the incident, provided corroborating testimony.  (*See* Hr'g Tr. 76–78.)  At the motion to suppress hearing, the court found the testimony of both officers to be consistent and very credible.  (*Id.* at 104.)

Martinez-Chavez argues that the destruction of the dispatch recordings leave him "without the best impeachment material for LT Hylton or at the very least, recordings which would clarify the CFS report and the timing." (Dkt. No. 72, at 6.)  During oral argument, he called attention to specific time discrepancies that he claims the dispatch recordings would resolve.  However, these minimal time discrepancies between the CFS Report and the BWC footage do not suggest anything nefarious when one understands how the CFS Report is created, which Martinez-Chavez overlooks.

5

Lieutenant Hylton testified that he would call dispatch to log times after events transpired in real-time. (Hr'g Tr. 42.) This means that the dispatch times on the CFS Report do not capture the events in real-time like a BWC would. Instead, Lieutenant Hylton radioed dispatch to log times after the events occurred. This explains the timing discrepancies Martinez-Chavez highlights. Lieutenant Hylton was pursuing Martinez-Chavez by himself, initiated the traffic stop, observed Martinez-Chavez reaching into the passenger side of the car and thought he might be reaching for a weapon, after which Lieutenant Hylton drew his gun on Martinez-Chavez. (*Id.* 10–17.) Given the tense and potentially dangerous situation Lieutenant Hylton faced, it is unrealistic to expect him to immediately call dispatch while managing the situation. After carefully considering each parties' arguments and reviewing the evidence—specifically the CFS Report, Lieutenant Hylton's testimony, and Officer Poulin's testimony—the court concludes that the dispatch recordings were not exculpatory. Therefore, the first prong of *Trombetta* has not been satisfied.

Second, even assuming the dispatch recordings were exculpatory, Martinez-Chavez can obtain comparable evidence by other reasonably available means. This comparable evidence includes, but is not limited to, Lieutenant Hylton's testimony, the corroborating testimony of Officer Poulin, who was on the phone with Lieutenant Hylton prior to the initiation of the traffic stop and who listened to the dispatch communications in real-time through his radio, other officers' written reports, as well as the CFS Report itself. The court need not recount all of the evidence and testimony provided, but it is clear that Martinez-Chavez has access to other evidence that allows him to piece together the events of January 1, 2024, prior to the activation of Lieutenant Hylton's BWC. As such, the second prong of *Trombetta* also has not been met. Therefore, Martinez-Chavez is not entitled to an adverse inference jury instruction or any other

relief for spoliation of evidence under *Trombetta*.

### B. Defendant is Not Entitled to an Adverse Inference Jury Instruction or Other Relief Under *Johnson*.

In *Johnson*, the Fourth Circuit noted, a criminal defendant may be entitled to an adverse inference jury instruction absent a due process violation. *Johnson*, 996 F.3d at 217 ("[A]n adverse inference instruction may be appropriate under the evidentiary rule relating to spoliation of evidence." (citing *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 155 (4th Cir. 1995))).

> That is, an adverse inference may be drawn against a party who loses or destroys relevant evidence where there is a showing that the party knew the evidence was relevant to some issue at trial and that his willful conduct resulted in its loss or destruction. In light of the willful conduct requirement, the mere negligent loss or destruction of evidence is an insufficient basis for an adverse inference. A finding of bad faith suffices to permit such an inference but is not always necessary. Rather, there simply needs to be a showing that the party's intentional conduct contributed to the loss or destruction of the evidence.

*Id.* (cleaned up). The decision to give an adverse inference jury instruction is at the discretion of the trial court. *Id.* (citing *Vodusek*, 71 F.3d at 155).

First, there is no evidence that the Government knew the recordings of radio communications between dispatch and the officers involved were relevant to an issue at trial. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. "The threshold for determining whether evidence is relevant is comparatively low." *United States v. Recio*, 884 F.3d 230, 235 (4th Cir. 2018) (internal citations omitted). Certainly, the dispatch recordings could provide additional context to Lieutenant Hylton's account of the events, making them relevant under Rule 401. However, there is no evidence to suggest that the Government knew the recordings would be relevant to an issue at trial. In his initial discovery request on May 1, 2024, Martinez-Chavez submitted a generic request for

7

evidence that might be "material to the preparation" of the defense. (Def. Disc. Req. 2.) It was not until October 24, 2024, that he specifically requested the dispatch calls. (Additional Disc. Req.) The email correspondence suggests that the Government cooperated with Martinez-Chavez's discovery requests to the best of its ability. (*See* Dkt. No. 72-3.) Pursuant to the Virginia Disposition Schedule, the records were destroyed after six months. Had Martinez-Chavez requested the records earlier, the Government would have known they were relevant and would have preserved them. As there is no evidence that the Government had prior knowledge of their relevance, the knowledge requirement for issuing an adverse inference jury instruction has not been met.

Second, even assuming the Government knew the evidence was relevant, Martinez-Chavez has failed to demonstrate that the Government's intentional conduct contributed to the loss or destruction of the dispatch recordings. Martinez-Chavez argues that the retention schedule should have been part of the investigative record, and therefore the dispatch recordings should have been retained for longer than six months. (Dkt. No. 72, at 5.) He claims that the Government acted willfully in preserving Lieutenant Hylton's BWC, pulling the CFS Report, and actively taking steps to preserve other evidence, but intentionally failed to pull the dispatch recordings. However, there was no evidence presented to suggest that dispatch recordings are typically part of an investigative case file.

While the retention schedule does indicate that "Investigative Case Files: Non-Serious Offenses" for unresolved cases are to be retained for a period of five (5) years and notes that this information may include "Dispatch/Communications Recordings [and] Emergency Calls" (*see supra* note 3), it does not require that such recordings be retained as part of an investigative case file. Martinez-Chavez has not provided any case law or other evidence suggesting otherwise.

8

The custodian responsible for the dispatch recordings testified about the record retention process, and her testimony did not indicate any willful action by the Government. The evidence shows that the dispatch recordings were properly retained and automatically disposed of six (6) months after January 1, 2024 in accordance with the Library of Virginia Record Retention and Disposition Schedule.

Therefore, there was no willful conduct on the part of the Government in the destruction of the dispatch recordings. As such, the willful conduct requirement for issuing an adverse inference jury instruction based on the spoliation of evidence has not been met.

### III.  CONCLUSION AND ORDER

For the foregoing reasons, it is hereby ORDERED that Martinez-Chavez's Motion for Adverse Jury Instruction or Other Relief for Spoliation of Evidence (Dkt. No. 72) is DENIED.

The clerk is directed to send a copy of this memorandum opinion and order to all counsel of record.

Entered: January 17, 2025.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
Chief United States District Judge